IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| The Estate of Juan Jauregui Samudio by its Administrator Rita Sanchez Fierro, and Rita Sanchez Fierro, Individually, | Case No. _____ |
| Plaintiffs, | |
| vs. | **JOINT NOTICE OF REMOVAL** |
| Tyson Fresh Meats, Inc., Rick Retzlaff, Jorge Sandoval, Tom Brower, Laurie Garcia, and Nathan Carnine, | |
| Defendants. | |

Defendants Tyson Fresh Meats, Inc. ("Tyson"), Rick Retzlaff, Jorge Sandoval, Tom Brower, Laurie Garcia, and Nathan Carnine jointly remove this civil action under 28 U.S.C. §§ 1331, 1441, 1442, and 1446. This Court has subject matter jurisdiction, and the case is removable because:

(1)     Plaintiffs' Petition at Law and Demand for Trial by Jury ("Petition" or "Pet.") challenges actions taken by Defendants at the direction of a federal officer, for which Defendants will have a colorable federal defense (28 U.S.C. § 1442(a)(1)); and

(2)     The Petition raises substantial and disputed issues of federal law related to national emergency declarations, federal critical infrastructure designations, and the Defense Production Act that must be decided by a federal forum (28 U.S.C. § 1331).

Removal is timely. Defendant Sandoval was served with the Petition on June 19, 2022, Tyson on June 21, Defendant Carnine on June 23, Defendant Brower on June 24, Defendant Garcia on June 26, and Defendant Retzlaff on June 29. This Notice is being filed within 30 days of each date of service. See 28 U.S.C. § 1446(b)(1); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

## BACKGROUND

For over two years, the United States has struggled with a global pandemic whose size and scope are without modern precedent. Tens of millions have been infected with the novel coronavirus, and more than a million Americans have died of complications related to COVID-19. The economic and human fallout from the pandemic has been severe. This case is brought by the Estate of Juan Jauregui Samudio and family members of Mr. Samudio, an individual who worked at a Tyson meat-processing facility in Storm Lake, Iowa. Plaintiffs allege Mr. Samudio contracted COVID-19 at work and later died of the disease. His death is tragic.

But Plaintiffs' allegations—including allegations of willful misconduct—are inaccurate and incorrect, and Tyson vigorously disputes Plaintiffs' claims. Tyson has worked from the beginning of the pandemic to follow federal workplace guidelines and has invested millions of dollars to provide employees with safety and risk-mitigation equipment. Tyson's efforts to protect its workers while continuing to supply Americans with food in the face of the pandemic continue to this day.

Removal is proper because this case seeks to countermand federal statutes and federal directions Tyson received to assist the federal government in its efforts to ensure that the greatest national health crisis in a century would not also spiral into a national food shortage. The Petition alleges that Tyson should have operated its Storm Lake facility differently during the COVID-19 pandemic, including by slowing production, and alleges Tyson improperly required Mr. Samudio to attend work despite the risk posed by the virus.

But that facility was operating as part of the federally designated "critical infrastructure" at the direction of, and under the supervision of, the President and numerous other federal officials, including the Office of the Vice President, U.S. Department of Homeland Security, U.S. Department of Agriculture, and U.S. Department of Transportation. Tyson worked hand-in-hand with federal officials from the time of the declaration of a national emergency on March 13, 2020 to safely continue operations to aid the federal government in accomplishing its duty to secure the national food supply. The President and the Secretary of Agriculture provided detailed instructions for meat and poultry processing facilities to continue operating, incorporating industry-specific guidance from the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA"). And after attempts by states to interfere with this national prerogative, the President again confirmed that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans" and "continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA," and that any "closures [of such facilities] threaten the continued functioning of the national meat and poultry supply chain" and "undermin[e] critical infrastructure during the national emergency." Exec. Office of Pres. Executive Order, *Delegating Authority Under the DPA With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* ("Food Supply Chain Resources"), 85 Fed. Reg. 26,313, 26,313, 2020 WL 2060381, at *1 (Apr. 28, 2020).

Indeed, two federal district courts have reached this exact holding in cases involving other Tyson facilities where materially identical issues were presented. *See Fields v. Brown*, 519 F. Supp. 3d 388, 395 (E.D. Tex. 2021) ("*Fields* Removal Order");

*Wazelle v. Tyson Foods, Inc.*, No. 2:20-CV-203-Z, 2021 WL 2637335 (N.D. Tex. June 25, 2021) ("*Wazelle* Removal Order").[1]

Because Defendants continued to operate Tyson's facilities at the direction of federal officers at the highest levels, who enlisted Tyson's help in the government's efforts to ensure that the pandemic would not disrupt the operation of America's critical infrastructure, a federal court must resolve this case.

## ARGUMENT

### I. Federal officer removal is proper under 28 U.S.C. § 1442(a)(1).

Under 28 U.S.C. § 1442(a)(1), a civil action may be removed to federal court if the action is asserted against a person acting under the direction of a federal officer:

> A civil action . . . that is against or directed to any of the following may be removed . . . :
>
> (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

---

[1] Defendants recognize that the Eighth Circuit has found no federal officer jurisdiction under similar circumstances in *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 734 (8th Cir. 2021). The Fifth Circuit also recently affirmed a grant of a motion to remand in a similar case in Texas. *See Glenn v. Tyson Foods, Inc.*, No. 21-11110, 2022 WL 2525724, at *5 (5th Cir. July 7, 2022). Defendants respectfully disagree with the *Buljic* and *Glenn* decisions and intend to timely file a petition for certiorari to the U.S. Supreme Court regarding the applicability of federal officer removal jurisdiction. Tyson also intends to petition for rehearing in *Glenn*.

While recognizing certain similarities between the issues presented in *Buljic* and *Glenn* and the issues presented here, Defendants nonetheless file this notice of removal (1) to preserve their right to a federal forum in the event Tyson's petition for certiorari is successful and (2) to argue certain issues that are not controlled or foreclosed by *Buljic*, most notably, Defendants' alternative basis for removal under 28 U.S.C. § 1331 and *Grable*.

28 U.S.C. § 1442(a)(1) (emphasis added). The federal officer removal statute is to be "liberally construed." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

Here, federal officer removal is proper because (1) Defendants "acted under the direction of a federal officer," (2) "there was a causal connection between [Defendants'] actions and the official authority," (3) Defendants have "a colorable federal defense to the plaintiff's claims," and (4) each Defendant "is a 'person,' within the meaning of the statute." *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021) (citing *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 967 n.2 (8th Cir. 2007)); *see also Fields* Removal Order, 519 F. Supp. 3d at 395 (upholding federal officer removal of similar claims); *Wazelle* Removal Order, 2021 WL 2637335, at *5 (same).[2]

**Federal Direction**. On March 13, 2020, the President "proclaim[ed] that the COVID-19 outbreak in the United States constitutes a national emergency," retroactive to March 1, 2020.[3] The federal government proceeded to devote significant effort to combating the pandemic and its potentially catastrophic effects, enlisting both

---

[2] Notably, removal is proper under 28 U.S.C. § 1442(a)(1) if any Defendant can satisfy the removal requirements as to any "one claim." *See, e.g.*, *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case.") (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017)); 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3726 (4th ed. 2022) ("Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction.").

[3] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

public and private entities in its efforts to ensure that the rapid spread of the disease would not disrupt the nation's critical infrastructure. A particular focus of that effort was the protection of the nation's food supply.

This "critical infrastructure" designation derives from the Critical Infrastructure Protection Act passed after 9/11, *see* 42 U.S.C. § 5195c(e), which instructed the Department of Homeland Security to develop plans to protect designated "critical infrastructure" in the event of future disasters. "Food and Agriculture" is one of the sixteen recognized "sectors" of critical infrastructure and is subject to a 2013 Presidential Policy Directive intended to "advance[] a national unity of effort to strengthen and maintain secure, functioning, and resilient critical infrastructure."[4] Coordinating protection of the Food and Agriculture Sector has been assigned to the U.S. Departments of Agriculture and Health and Human Services, which have an extensive plan[5] "to protect against a disruption anywhere in the food system that would pose a serious threat to public health, safety, welfare, or to the national economy."[6]

The Defense Production Act ("DPA"), 50 U.S.C. § 4501 *et seq.*, provides the federal government with additional authority. The DPA grants the President authority to "control the general distribution of any material in the civilian market" that the President deems "a scarce and critical material to the national defense." *Id.* § 4511(b). The Critical Infrastructure Protection Act expressly cross-references the DPA and characterizes the emergency preparedness activities that both statutes contemplate

---

[4] Press Release, Office of the Press Secretary, *Presidential Policy Directive -- Critical Infrastructure Security and Resilience* (Feb. 12, 2013), https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil.

[5] CISA, *Critical Infrastructure Sectors* (Oct. 21, 2020), https://www.cisa.gov/critical-infrastructure-sectors.

[6] *Food and Agriculture Sector-Specific Plan* (2015), https://www.cisa.gov/sites/default/files/publications/nipp-ssp-food-ag-2015-508.pdf at 13.

as part of the "national defense." *See* 42 U.S.C. § 5195a(b). The statutes vest the President with ample authority to direct the operation of critical infrastructure like the distribution of meat and poultry to protect the national food supply chain—a point the President underscored shortly after declaring a national emergency. *See Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, The White House (Mar. 18, 2020), https://bit.ly/2Nh91XZ ("We'll be invoking the Defense Production Act, just in case we need it.").

From the time of the President's disaster declaration on March 13, 2020, Tyson was in close contact with federal officials regarding continued operations as critical infrastructure and acting at the direction of those officials. For example, on March 15, 2020 (just two days after declaring a national emergency), in response to significant hoarding of food and other items, the President personally met with Tyson and other food industry companies to convey that they would thereafter be "working hand-in-hand with the federal government" to ensure that "food and essentials are constantly available," and that food suppliers would "work 24 hours around the clock" to achieve that goal.[7]

The next day, on March 16, 2020 the President reinforced this obligation to aid the federal government by issuing "Coronavirus Guidelines" emphasizing that employees in "critical infrastructure industr[ies]"—including companies like Tyson that are essential to maintaining food-supply chains and ensuring the continued health and safety of all Americans—have a "special responsibility" and "should follow CDC

---

[7] Matt Noltemeyer, *Trump Meets with Food Company Leaders* (Mar. 16, 2020), https://www.foodbusinessnews.net/articles/15621-trump-meets-with-food-company-leaders.

guidance to protect [employees'] health at work." Exec. Office of Pres., *The President's Coronavirus Guidelines for America* at 2 (Mar. 16, 2020).[8]

Over the next weeks, Tyson was in frequent contact with federal officers regarding the best way to safely continue operations, in particular with the Department of Agriculture's Food Safety Inspection Service ("FSIS"). In fact, FSIS employees were on-site at Tyson's facilities, and Tyson's employees carried letters identifying them as "critical infrastructure" workers so that those employees could explain their exemption from local lockdowns should any authorities question them.

Federal officials also continued to emphasize the need for companies in the Food and Agriculture Sector to keep operating pursuant to unified, federal guidance. For example, in an April 7, 2020 statement, Vice President Pence stressed that "we need [food industry workers] to continue, as a part of what we call our critical infrastructure, to show up and do your job and know that we're going to continue to work tirelessly in working with all of your companies to make sure that that workplace is safe."[9] Congress even appropriated supplemental funding to FSIS to accommodate the continued presence of FSIS at facilities, including Tyson's facilities, during the pandemic. The Department of Agriculture and Federal Emergency Management Agency worked to provide Tyson and federal workers at Tyson's facilities with the necessary personal protective equipment to continue to operate, and the Department of Transportation provided special status for transportation workers, including Tyson

---

[8] https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

[9] Press Briefings, *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing* (Apr. 7, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-april-7-2020/.

truck drivers delivering meat and poultry, to operate during the pandemic and provide much needed food to restock stores during the emergency.

But notwithstanding the close collaboration between Tyson and federal officials to safely continue operations, state and local officials began asserting contradictory authority with respect to meat and poultry processing facilities. Those state actions led to an Executive Order re-emphasizing federal supremacy with respect to meat and poultry facilities. On April 28, 2020 President Trump formalized his invocation of his authority under the DPA and again directed that it was federal policy that meat and poultry processing companies continue operating subject to the supervision of the Secretary of Agriculture. *See* Food Supply Chain Resources, 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The executive order states in relevant part:

> It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain **continue operating and fulfilling orders** to ensure a continued supply of protein for Americans. . . . [R]ecent actions in some States have led to the complete closure of some large processing facilities.
>
> \*      \*      \*
>
> Such closures **threaten the continued functioning** of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency.
>
> \*      \*      \*
>
> [T]he Secretary of Agriculture shall take all appropriate action . . . to **ensure that meat and poultry processors continue operations** consistent with the guidance for their operations jointly issued by the CDC and OSHA.

*Id.* (emphases added).

Just a few days later, on May 1, 2020, the Secretary of Agriculture sent a separate letter addressed *specifically to Tyson* to further confirm Tyson's obligation to assist the federal government. Letter to Noel White from Sonny Perdue, Sec'y of

Agric., *Re: Executive Order Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 1, 2020).[10] In that letter, the Secretary instructed Tyson that "[e]ffective immediately, meat and poultry processing plants should utilize the guidance issued on Sunday, April 26, 2020, by CDC and OSHA specific to the meat and poultry processing industry to implement practices and protocols for staying operational or resuming operations while safeguarding the health of the workers and the community." *Id*. The Secretary made clear that this instruction was not optional. Instead, the Secretary was acting pursuant to express directions from the President under the DPA to protect the "paramount" objective of maintaining meat and poultry processors' operations during the national crisis. *Id*. The Secretary also confirmed that these instructions were a *continuation* of prior directives. *See id*. ("USDA will continue to work with plants, CDC, OSHA, and State, Tribal, and local officials to ensure that facilities are implementing practices consistent with the guidance to keep employees safe and continue operations.") And he made clear that, if these directives were not complied with or were not enough to secure the nation's food supply, Tyson could expect that "[f]urther action" would "be taken." *Id*.

The following week, acting under the Executive Order, the Secretary of Agriculture issued a similar letter directing meat-processing plants to either remain open or submit written plans to reopen. Letter from Sonny Perdue, Sec'y of Agric., *Re: Executive Order 13917 Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 5, 2020). That letter reiterated that meat and poultry producers played "an integral role in the continuity of our food supply chain," and instructed them "[e]ffective immediately" to "utilize the guidance issued . . . by the

---

[10] *See* Attachment L to Declaration of Barbara Masters, Dkt. Entry No. 26-2, *Everhard v. Tyson Foods, Inc.*, Case No. 5:21-cv-04002 (N.D. Iowa July 15, 2022).

CDC and OSHA specific to the meat and poultry processing industry" to "safeguard[] the health of the workers and the community while staying operational or resuming operations." *Id.* The Secretary instructed that plants that had been closed due to the COVID-19 pandemic "should resume operations as soon as they are able after implementing the CDC/OSHA guidance for the protection of workers" and "directed" such plants to submit "written documentation" of their plans for doing so. *Id.* Finally, the Secretary made clear that, "if necessary," "*[f]urther action* under the Executive Order and the [DPA]" would be taken. *Id.* (emphasis added). Moreover, consistent with the Food Supply Chain Resources Executive Order and prior directives, the Secretary of Agriculture also issued a letter to state and local officials across the nation reiterating their obligation to work with the Secretary to ensure meat and poultry processing companies' compliance with federal directives. *See* U.S. Dep't of Agriculture, Press Release No. 0243.20 (May 6, 2020) (announcing that the Secretary had issued a "Letter to Governors").[11]

The U.S. Department of Agriculture also entered into a Memorandum of Understanding with the U.S. Food and Drug Administration ("FDA") setting forth the respective roles of each agency in utilizing the DPA to regulate food producers during the COVID-19 outbreak. *See Memorandum of Understanding Between FDA and USDA Regarding the Potential Use of the Defense Production Act with Regard to FDA-Regulated Food During the COVID-19 Pandemic* (May 18, 2020).[12] Notably, the agreement reiterated that "actions by States or localities could lead to the closure of food resource facilities," and such closures "could threaten the continued functioning

---

[11] https://www.usda.gov/media/press-releases/2020/05/06/secretary-perdue-issues-letters-meat-packing-expectations

[12] https://www.usda.gov/sites/default/files/documents/mou-between-fda-usda-dpa.pdf

of the national food supply chain, undermining critical infrastructure during the national emergency." *Id.* at 1-2.

Accordingly, Tyson's facilities—including the Storm Lake facility—were operating "under the direction of multiple federal agencies" as part of the federal "critical-infrastructure designation" "since [the declaration of a national emergency on] March 13, 2020," *Fields* Removal Order, 519 F. Supp. 3d at 393 & n.1, and Defendants "exhibited 'an effort to help assist, or carry out, the duties and tasks of the federal superior.'" *Wazelle* Removal Order, 2021 WL 2637335, at *4 (quoting *Watson*, 551 U.S. at 152). As such, Tyson was "acting under" the direction of a federal officer, 28 U.S.C. § 1442(a)(1), and "helping the Government to produce an item that it needs" for the national defense, *Watson*, 551 U.S. at 153; *see also Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486-87 (1st Cir. 1989) (holding that "the reach of section 1442(a)(1) extends to private persons . . . who act under the direction of federal officers," including companies ordered to "facilitate" or "offer[] technical assistance" to federal agents exercising statutory authority).

Indeed, it is well established that private providers to the government of products or services, including military products (*see, e.g.*, *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016)) or health benefits (*see, e.g.*, *Jacks*, 701 F.3d at 1230-35), can invoke federal officer removal. Here, Tyson was acting at the direction of, and hand-in-hand with, federal officers in a time of emergency to provide the food security that the government recognized it could not accomplish alone. *See, e.g.*, *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("[T]he Supreme Court has approved removal" in cases where "defendants work[ed] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.").

And with respect to the DPA in particular, the President made clear on March 24, 2020, that companies were acting under the DPA: "The Defense Production

Act is in full force, but haven't had to use it because no one has said NO!"[13] Such dynamics amount to government orders and actions—that "the threat of mandatory powers would be used as a 'big stick' to induce voluntary cooperation," and that the DPA's "broad authority" can be exercised through either "formal, published regulations" or "informal and indirect methods of securing compliance." *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 992-93, 998 (5th Cir. 1976) (citation omitted).

As courts have recognized, that broad interpretation of "acting under" is especially applicable in a time of emergency because "a cumbersome and inflexible administrative process is antithetical to the pressing necessities." *Id.* at 998. Just like a private chauffeur enlisted by a federal officer to drive in hot pursuit of a fleeing suspect, here Tyson was enlisted to carry out paramount government objectives in a fast-moving crisis. *See Maryland v. Soper*, 270 U.S. 9, 30 (1926) (chauffeur acting under orders of federal officers had "the same right to the benefit of [federal-officer removal] as they"). In both cases, there is federal direction even though there is no time for a formal deputization. Indeed, the President formalized his prior invocations of the DPA on April 28 only in response to state and local governments' failure to heed the Executive Branch's earlier directives to meat and poultry processors. Thus, "[t]o the extent some of the federal direction may have been more 'informal,' including emails, phone calls, and weekly meetings with FSIS and other federal officials regarding how to maintain operations safely, that informality does not change the fact that [Tyson was] still receiving and following federal direction." *Wazelle* Removal Order, 2021 WL 2637335, at *4 n.3.[14]

---

[13] Salvador Rizzo, *What to Know about the Defense Production Act*, The Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/politics/2020/03/25/is-trump-using-defense-production-act/.

[14] Indeed, even if a formal, coercive demand was the standard, it is unclear what more would be expected to satisfy this standard than consistent government

Consistent with the finding of federal officer removal in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), *holding modified by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc), the federal government here (1) provided "detailed specifications" governing Tyson's ongoing operations—through the federal direction that the CDC and OSHA guidelines would govern operations, and promulgation of exceedingly detailed guidelines; and (2) exercised "on-going supervision" of those operations through multiple federal officials, *id.* at 399-400. This "on-going supervision" was performed by, among others, the Secretary of Agriculture, who was delegated power by both the Department of Homeland Security to preserve the Food and Agriculture Sector during the pandemic and the President to "take all appropriate action . . . to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The Petition challenges Defendants' failure to slow, alter, or halt production at the Storm Lake facility and the various measures that were taken at the facility. [*See* Pet. ¶¶ 26-27] But Tyson's alleged actions of which Plaintiffs complain were taken pursuant to the authority, orders, detailed regulation, and supervision of federal officers, up to and including the President and Vice President.

Defendants were "acting under" federal officers and are entitled to have this case heard in federal court. *See Fields* Removal Order, 519 F. Supp. 3d at 393 ("[B]ased on the critical-infrastructure designation, [Tyson was] 'acting under' the directions of federal officials when the federal government announced a national emergency on March 13."); *Wazelle* Removal Order, 2021 WL 2637335, at *5 ("[Tyson and individual Tyson employee-defendants] were 'acting under' the directions of

_____

direction culminating in an Executive Order and subsequent exhortation from the Secretary of Agriculture pursuant to that Order.

federal officials" from the time of the national emergency declaration.); *see* 28 U.S.C. § 1442(a)(1).

**Connection or Association**. Following the text of 28 U.S.C. § 1442(a)(1), it suffices if the lawsuit targets actions Defendants took "relating to" the directions of federal officers, which requires that Plaintiffs' allegations be "connected or associated with" Defendants' actions taken "pursuant to a federal officer's directions." *See Latiolais*, 951 F.3d at 296; *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (same); *Papp*, 842 F.3d at 813 (same). Here, there is a *direct* connection between the Petition's allegations and the actions Defendants took at the direction of federal officers. *See Fields* Removal Order, 519 F. Supp. 3d at 393-94 (holding on similar facts that direct connection existed between Tyson's actions and the plaintiffs' allegations); *Wazelle* Removal Order, 2021 WL 2637335, at *5 (same).

As noted above, the Petition alleges that Tyson is liable in tort for not altering the pace of production at the Storm Lake facility and allowing employees to continue working given the supposedly high risk of them contracting COVID-19 (*e.g.*, Pet. ¶¶ 26-27), even though Tyson's facilities were operating as critical infrastructure under federal directions during a national emergency. Likewise, the Petition challenges specific measures that Tyson adopted or allegedly failed to adopt in response to the coronavirus. [*Id.* ¶ 26] But the measures Tyson took were at the direction of federal officers to continue safe operations as critical infrastructure during a national emergency and as directed by the President and Secretary of Agriculture pursuant to an Executive Order expressly invoking the DPA. Any dispute that Tyson should have operated differently from the federal directions it received in a national emergency should be for the "federal—not state—courts to answer." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (federal courts must resolve "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically

directed by the federal Government") (citing *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)).

Colorable Federal Defenses. Defendants have at least the following federal defenses to the claims in the Petition.

- **Express preemption under the Federal Meat Inspection Act ("FMIA").**[15] The FMIA's express preemption clause preempts state-law requirements that are "in addition to" or "different than" the rigorous and extensive federal requirements under the statute. *See* 21 U.S.C. § 678; *see also, e.g.*, 9 C.F.R. § 416.5(c) (setting federal requirements under the FMIA regarding cleanliness, protective attire, and "[d]isease control"). As construed by the Supreme Court, "[t]he FMIA's preemption clause sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act and concern a slaughterhouse's facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012).

  Indeed, two district courts in Texas have dismissed *on the merits* substantially similar state-law tort claims, finding that because those claims would "impose requirements 'in addition to' those authorized and promulgated under the PPIA [and FMIA]," they are preempted by federal law. *Fields v. Tyson Foods, Inc.*, 561 F. Supp. 3d 717, 720 (E.D. Tex. 2021) (PPIA); *Johnson v. Tyson Foods, Inc.*, No. 2:21-CV-156-Z-BR, -- F. Supp. 3d --, 2022 WL 456897, at *3 (N.D. Tex. Jan. 20, 2022) (FMIA).

  Plaintiffs here would use state tort law to impose additional and different requirements at the Storm Lake facility, and the claims therefore "fall

_____

[15] The Storm Lake facility is subject to regulation under the FMIA. *See FSIS Meat, Poultry and Egg Product Inspection Directory* at 553-54 (June 7, 2021), https://www.fsis.usda.gov/sites/default/files/media_file/2021-06/MPI_Directory_by_Establishment_Name_0.pdf (identifying the Storm Lake facility as establishment numbers M244 + V244).

within FMIA's express preemption provision." *Johnson*, 2022 WL 456897, at \*4.

- **Preemption and immunity under the DPA and extensive federal directives.**
Plaintiffs' claims are also preempted by the DPA and the extensive federal supervision and control under which Defendants were operating. *See id.* (dismissing similar state-law claims under Rule 12(b)(6) as preempted by the DPA). Congress enacted the DPA to preserve "the security of the United States" by ensuring "the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to . . . natural or man-caused disasters," and in particular to "provide for the protection and restoration of domestic critical infrastructure operations under emergency conditions." 50 U.S.C. § 4502(a)(1), (a)(2)(C). The DPA grants the President wide latitude to "take appropriate steps to maintain and enhance the domestic industrial base," *id.* § 4502(a)(4), including "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate" during a national emergency, *id.* § 4511(a). This broad grant of authority preempts any attempt by a state to impose its own regulations on "domestic critical infrastructure" industries when the President has done so under the DPA. *Id.* § 4502(a)(2)(C); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000). And it provides an express defense against suits like this for actions taken in compliance with orders issued under the DPA. 50 U.S.C. § 4557.

The Petition here seeks to impose state regulation that conflicts with the President's express directives under the DPA requiring Defendants to assist the nation during a national disaster by (1) continuing to operate (2) pursuant to federal operational requirements.

**Defendants are "persons."** All Defendants, including the Tyson entities, are "persons" under 28 U.S.C. § 1442 because the term "includes corporations." *Jacks*, 701 F.3d at 1230 n.3 (citing *Watson*, 551 U.S. at 152-53).[16]

## II.    The Court also has federal question jurisdiction.

This case is properly removed under 28 U.S.C. § 1331 because it "aris[es] under" federal law. *See Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521 (8th Cir.), *cert. denied*, 141 S. Ct. 621 (2020); *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 721-22 (5th Cir. 2017). Although Plaintiffs' causes of action are styled as state-law claims, this Court has federal question jurisdiction because the claims (1) "necessarily" raise an issue of federal law that is (2) "actually disputed" and (3) "substantial," and (4) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see also Wullschleger*, 953 F.3d at 521 (removal is proper where claim pleaded under state law "implicat[es] a disputed and substantial federal issue").

**Federal issues are necessarily raised.** The Petition necessarily raises multiple, substantial federal issues. The entire thrust of the Petition is that Tyson should not have complied with express federal directives related to the national defense—*i.e.*, should have slowed production or not allowed workers to come in (*e.g.*, Pet. ¶¶ 26(I), 27); should have taken more or different measures than were mandated by the federal directives (*id.* ¶ 26); or failed to comply with federal law by allegedly failing to take certain precautions (*see id.*). These issues directly implicate the "uniquely

---

[16] Although all Defendants who have been served jointly remove this case, only one Defendant needs to establish a right to remove under 28 U.S.C. § 1442(a)(1), and "the entire case [is] deemed removable, such that [Plaintiffs'] claims against all other defendants . . . will be heard in federal court as well." *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018); *see also* 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3726 (4th ed. 2022) (same).

federal interest" in "civil liabilities" arising from the government's defense priorities determinations, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505-07 (1988), and none of these issues can be resolved "without reliance on and explication of federal law." *Wullschleger*, 953 F.3d at 522.

To the contrary, these federal issues are plainly and necessarily raised by the Petition (*e.g.*, Pet. ¶¶ 16, 17, 19 (citing the President's emergency declaration, OSHA guidance regarding COVID-19, and emergency declaration by the Department of Health and Human Services)), and they permeate Plaintiffs' claims—from the measures Tyson allegedly adopted or failed to adopt (*e.g.*, Pet. ¶ 26(H)) (alleging Defendants "[f]ail[ed] to comply with . . . Federal laws, rules and regulation"), to Tyson's decision not to "slow down or otherwise alter" the Storm Lake facility (*id.* ¶ 26(I)) despite the extensive federal directives to remain operational. Having "elected to premise" its claims on "interpretations of federal law," Plaintiffs cannot avoid this Court's jurisdiction. *Wullschleger*, 953 F.3d at 522.

**The federal issues are "substantial."** The Petition implicates federal imperatives of the highest and broadest importance: coordination of national disaster relief and the maintenance of infrastructure "essential to the national defense." 50 U.S.C. § 4511(b); *see also Scrogin v. Rolls-Royce Corp.*, No. 3:10cv442 (WWE), 2010 WL 3547706, at *3 (D. Conn. Aug. 16, 2010) ("[P]laintiffs' state tort claims give rise to serious federal interests in the government procurement contract and military operations."); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201-02 (M.D. Fla. 2006) (holding that "the federal issues [were] quite substantial" where national defense and procurement were implicated).

Moreover, "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal . . . scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs of Se. La.*, 850 F.3d at 724. The "implications for the federal regulatory scheme" of such liability—particularly where the federal

scheme relates to critical infrastructure during a national emergency—"would be significant." *Id.*; *see also Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 441 (5th Cir. 2019) (noting that the substantiality requirement is satisfied where a case "put[s] the legality of a federal action in question, in a manner that would have broader ramifications for the legal system"). Thus, there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum" for these claims. *Grable*, 545 U.S. at 313; *see also Rose v. SLM Fin. Corp.*, Civ. A. No. 3:05CV445, 2007 WL 674319, at *4 (W.D.N.C. Feb. 28, 2007) ("Where a federal regulatory scheme requires private parties to undertake certain actions in order to comply with the law, the federal courts necessarily have a serious interest in examining the scope of liability that might arise as a result.").

**Actual dispute.** The federal interests are also actually disputed. *See Wullschleger*, 953 F.3d at 522 (finding federal issues actually in dispute where the plaintiffs "explicitly claim[ed] that defendants violated the FDCA, were non-compliant with FDA guidance, and that their refusal to [seek] FDA review was improper"); *Bd. of Comm'rs of Se. La.*, 850 F.3d at 723 (finding federal issues actually in dispute where the parties disagreed as to whether the defendants complied with federal law). The Petition seeks to impose state-law liability on Defendants for actions taken pursuant to federal directions, and the Petition's overarching theory is that Tyson allegedly failed to comply with federal directions in some respects and should have exceeded (or otherwise deviated from) federal directions in other respects. These issues—what was required under the *federal* orders and whether states can override the *federal* orders—constitute the central dispute in this case.

**Balance of responsibilities.** Finally, exercising jurisdiction over this case will not disturb—and, in fact, will preserve—the congressionally approved balance of federal and state judicial responsibilities. The United States has not faced a pandemic like this since the Spanish flu more than a century ago, and the emergency federal

powers and planning directives are by their nature limited to a narrow set of circumstances. As explained above, Tyson's facilities were designated as "critical infrastructure" essential to the national defense and directed to continue operating in this national emergency. Moreover, through the DPA, Congress delegated to the President "an array of authorities" to "take appropriate steps to maintain" critical infrastructure—because the "national defense" and "security of the United States" depend upon it. 50 U.S.C. § 4502(a)(1), (4).

Accordingly, there is a "clear interest" in "the availability of a federal forum" for this case, which directly challenges the Executive Branch's orders related to this emergency under the DPA and other federal statutes and federal directions related to those orders. *Grable*, 545 U.S. at 319-20; *see also Bd. of Comm'rs of Se. La.*, 850 F.3d at 725 (holding that jurisdiction was appropriate because "the scope and limitations" of federal framework were at stake, and deciding "whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other"). And exercising jurisdiction over Plaintiffs' claims "would not materially affect, or threaten to affect, the normal currents of litigation," given the "rare" circumstances here. *Grable*, 545 U.S. at 319-20.

## III. Defendants have satisfied the procedural requirements for removal.

Venue is proper in this district under 28 U.S.C. §§ 95(a)(2) and 1441(a) because the United States District Court for the Northern District of Iowa, Western Division, embraces the county (Buena Vista) in which the state court action is now pending.

Pursuant to 28 U.S.C. § 1446(b)(2)(A), consent from all Defendants is not necessary to remove this action, as it is not being "removed solely under section 1441(a)." It is also being removed under section 1442(a)(1). Nonetheless, all Defendants hereby consent to removal.

Copies of all process and pleadings filed in the state case are attached hereto as **Exhibit A**. LR 81(a)(1); *see also* 28 U.S.C. § 1446(a). No orders have been filed.

Defendants also provide the attached LR 81 Statement in accordance with Local Rule 81(a). On July 11, 2022, Defendants filed an Unresisted Motion to Extend the Time to Answer or Otherwise Plead in Response to Plaintiffs' Petition, which is pending before the Buena Vista County District Court.

Defendants will promptly provide written notice of this filing to all adverse parties and will file a copy of this Notice of Removal with the clerk of the state court where this suit is currently pending. 28 U.S.C. § 1446(d).

## CONCLUSION

For the foregoing reasons, Defendants respectfully remove this action bearing case number LACV034806, from the District Court for Buena Vista County, Iowa pursuant to 28 U.S.C. §§ 1331, 1441, 1442, and 1446.

/s/ Kevin J. Driscoll

Kevin J. Driscoll     AT0002245
Eric G. Hoch           AT0003486
**FINLEY LAW FIRM, P.C.**
699 Walnut Street, Suite 1700
Des Moines, Iowa 50309
Telephone:  515-288-0145
Facsimile:  515-288-2724
Email: kdriscoll@finleylaw.com
            ehoch@finleylaw.com

Christopher S. Coleman
(*Pro hac vice* forthcoming)
Jessica L. Everett-Garcia
(*Pro hac vice* forthcoming)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  602-351-8000
Facsimile:  602-648-7000
Email: CColeman@perkinscoie.com
            JEverettGarcia@perkinscoie.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that, on July 19, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF system as follows:

Mary C. Hamilton
**Hamilton Law Firm, P.C.**
P. O. Box 188
606 Ontario Street
Storm Lake, Iowa 50588
712.732.2842 / 712.732.6202 (fax)
willis@hamiltonlawfirmpc.com

*Attorneys for Plaintiffs*

/s/  Kevin J. Driscoll